UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| SCOTT LAMBERT,<br><br>    Plaintiff,<br><br>vs.<br><br>LIBERTY MUTUAL FIRE INSURANCE COMPANY; ELITHA STOCKETT,<br><br>    Defendants. | 2:14-CV-00521 JWS<br><br>ORDER AND OPINION<br><br>[Re: Motion at doc. 111] |

## I. MOTION PRESENTED

Defendants Liberty Mutual Fire Insurance Company ("Liberty") and Elitha Stockett ("Stockett"; collectively "Defendants") filed a motion for summary judgment at docket 111, with supporting statement of facts at docket 112 and supporting documentation at docket 117 and docket 118. Plaintiff Scott Lambert ("Plaintiff") responded at docket 140 with his responsive supporting statement of facts at docket 139 and supporting documentation at docket 161. Defendants' reply is at docket 158, and their response and objections to Plaintiff's statement of facts is at docket 159. Oral argument was requested, but it would not be of additional assistance to the court.

## II. BACKGROUND

Plaintiff is a pilot who worked for Airline Training Center Arizona, Inc. ("ATCA"). In late 2012 Plaintiff had surgery on his right knee and arm and was on medical leave until the spring of 2013. Shortly after returning from leave, on April 28, 2013, Plaintiff injured himself while stepping out of an aircraft following a training flight. No one witnessed the incident. Plaintiff initially reported that the accident happened while "stepping off the aircraft wing" and that "his knee gave out."[1] He also filled out a lesson

---

[1] Doc. 117-3 at p. 7.

cancellation report that day, noting that he "hurt [his] knee getting out of [a] plane."[2] He saw a nurse practitioner the next day, and her notes indicate his injury was to the right knee.[3] The injury was reported to Liberty, ATCA's workers' compensation insurance provider. Stockett was the assigned adjuster.

Within a few days, Plaintiff later expounded on his injury when describing it to doctors and to Stockett. He stated that the work incident involved a fall. Stockett's notes indicate that Plaintiff reported to her that his right knee buckled and he fell to the ground on his right knee and wrist.[4] One of his doctor's reports from a visit shortly after the incident indicates that Plaintiff thought his left knee may have hit the ground as well.[5] He complained of pain in his right knee, wrist, and elbow, as well as pain or soreness in his left knee.[6] He continued to see various doctors for the injuries throughout May of 2013. On May 31, Stockett wrote in the case file notes that she was denying the workers' compensation claim because his reported injuries were prior injuries, but she also indicated that her decision could be rescinded upon additional investigation.[7] She filled out an Industrial Commission of Arizona ("ICA") form—a "Notice of Claim Status"—to deny the claim, but she did not send the form to the ICA that day.[8]

In early June, Plaintiff filled out another ICA injury report about the incident, explaining that his right knee gave out and then he fell on his left knee and arm and

---

[2]Doc. 117-3 at p. 8.

[3]Doc. 118-2 at pp.19-35, 37.

[4]Doc. 161 at p. 69.

[5]Doc. 161-3 at p. 30.

[6]Doc. 161-3 at p. 30; Doc. 161 at p. 69; Doc. 118-4 at p. 23; Doc. 118-5 at p. 75.

[7]Doc. 161 at p. 64.

[8]Doc. 117-4 at p. 4 (dated May 31, 2013, but not faxed until June 28, 2013).

right wrist.[9] The insurance case file at this time noted that the claim status as "denial pending complete investigation."[10] Plaintiff continued to see various doctors for his injuries throughout June. He obtained a MRI of his right knee and elbow on June 24. While there had been two doctors who had recommended a left knee MRI and indicated as much in their medical reports, that MRI was not obtained. Liberty never received a formal request for the left knee MRI authorization. In late June, Stockett requested an independent medical examination ("IME") of Plaintiff.[11] Before an IME could take place, Stockett filed her Notice of Claim Status form with the ICA, officially denying the claim.[12]

    Plaintiff went back to modified work duty on July 1, 2013, after his orthopedic surgeon issued a work release.[13] In July, Plaintiff filed paperwork with the ICA to request a hearing regarding his claim. Stockett was no longer working on Plaintiff's claim. Liberty again noted the need for an IME, which took place on July 23. The IME doctor recommended a MRI of Plaintiff's left knee and right wrist and a consult for his left and right hands, but nonetheless indicated that Plaintiff could work unrestricted as to his left knee and with modifications as to his right hand.[14] He cleared Plaintiff as to his right knee and right elbow.[15] Liberty eventually authorized the left knee MRI in late August after some back and forth between the new adjuster assigned to the claim, Leona Fox, and Plaintiff regarding whether the left knee was appropriately included as

---

[9]Doc. 117-4 at p. 2.

[10]Doc. 161 at p. 63.

[11]Doc. 161 at p. 63.

[12]Doc. 117-4 at p. 4.

[13]Doc. 161-3 at p. 28.

[14]Doc. 161-2 at p. 7.

[15]Doc. 161-2 at p. 7.

part of the work-place injury. The left knee MRI indicated that Plaintiff had suffered a tear.[16] He was again taken off work on September 3, 2013, and scheduled for surgery on his knee.[17] Liberty eventually filed notice with the ICA that it was accepting the workers' compensation claim, and in September Liberty issued payment of temporary disability benefits for the period of April 29, 2013 to June 30, 2013, as well as payment for medical expenses incurred.[18]

Plaintiff filed a complaint against Liberty and Stockett for insurance bad faith. Plaintiff alleges that Defendants denied timely payment of his workers' compensation benefits without a reasonable basis or adequate investigation. Plaintiff concedes that Liberty's handling of his workers' compensation claim as of September 4, following its acceptance of the claim, complied with the covenant of good faith and fair dealing.[19] Therefore, the dispute centers around Defendants' conduct from the date of injury, April 28, 2013, to the time it filed its notice of claim acceptance with the ICA on September 4, 2013.

## III.  STANDARD OF REVIEW

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[20] The materiality requirement ensures that "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."[21] Ultimately, "summary judgment will not lie if the . . . evidence is such that

---

[16] Doc. 117-1 at p. 4.

[17] Doc.161-3 at p. 26.

[18] Doc. 139 at ¶¶ 72, 73, 88.

[19] Doc. 139 at ¶ 77.

[20] Fed. R. Civ. P. 56(a).

[21] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

a reasonable jury could return a verdict for the nonmoving party."[22] However, summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."[23]

The moving party has the burden of showing that there is no genuine dispute as to any material fact.[24] Where the nonmoving party will bear the burden of proof at trial on a dispositive issue, the moving party need not present evidence to show that summary judgment is warranted; it need only point out the lack of any genuine dispute as to material fact.[25] Once the moving party has met this burden, the nonmoving party must set forth evidence of specific facts showing the existence of a genuine issue for trial.[26] All evidence presented by the non-movant must be believed for purposes of summary judgment, and all justifiable inferences must be drawn in favor of the non-movant.[27] However, the non-moving party may not rest upon mere allegations or denials, but must show that there is sufficient evidence supporting the claimed factual dispute to require a fact-finder to resolve the parties' differing versions of the truth at trial.[28]

---

[22]*Id.*

[23]*Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

[24]*Id.* at 323.

[25]*Id.* at 323-25.

[26]*Anderson,* 477 U.S. at 248-49.

[27]*Id.* at 255.

[28]*Id.* at 248-49.

## IV. DISCUSSION

"The tort of bad faith arises when the insurer 'intentionally denies, fails to process or pay a claim without a reasonable basis.'"[29] A bad-faith claim is a combination of a negligence action and an intentional tort and therefore is comprised of an objective and a subjective element. An insured must show that the insurer (1) acted unreasonably, and (2) knew or recklessly disregarded the fact that its conduct was unreasonable.[30]

As to the objective element, the issue is whether "the insurance company [acted] in a manner consistent with the way a reasonable insurer would be expected to act under similar circumstances."[31] An insurer is liable for bad faith if it unreasonably denies a clearly legitimate claim; that is, if it denies a claims that was "not fairly debatable."[32] An insurer can also be liable for bad faith if it acted unreasonably in processing the claim.[33] Therefore, even if a claim is ultimately accepted, an insurer can nonetheless be liable for bad faith if it handled the claim in an unreasonable manner.[34] As for the subjective element, negligence or inadvertence is not enough.[35] The insurer

---

[29]*Zilisch v. State Farm Mut. Auto. Ins. Co.*, 995 P.2d 276, 279-80 (Ariz. 2000) (citing *Noble v. Nat'l Am. Life Ins. Co.*, 624 P.2d 866, 868 (Ariz. 1981)).

[30]*Lukes v. Am. Family Mut. Ins. Co.*, 455 F. Supp. 2d 1010, 1016 (D. Ariz. 2006).

[31]*Id.*

[32]*Zilisch,* 995 P.2d at 279; *see also Young v. Liberty Mut. Grp. Inc.*, No. 12-cv-2302, 2015 WL 1209621, at *3(D. Ariz. 2015).

[33]*Zilisch*, 995 P.2d at 279-80; *see also Young*, 2015 WL 1209621, at *3-*4.

[34]*Zilisch*, 995 P.2d at 280.

[35]*Trus Joist Corp. v. Safeco Ins. Co. of Am.*, 735 P.2d 125, 134 (Ariz. Ct. App. 1986).

must intend the unreasonable act.[36] The subjective element is met if the insurer lacked a "founded belief" in the propriety of its conduct toward the insured.[37]

The question of whether an insurer was objectively reasonable is not automatically a question of fact. On a motion for summary judgment, "the appropriate inquiry is whether there is sufficient evidence from which reasonable jurors could conclude that in the investigation, evaluation, and processing of the claim, the insurer acted unreasonably and either knew or was conscious of the fact that its conduct was unreasonable."[38] However, the insurer's "founded belief" in its conduct is more typically an issue for the jury given the subjective nature of the inquiry, but the plaintiff must nonetheless offer some probative evidence that calls into question the insurer's belief in the reasonableness of its conduct.[39] Evidence of a lack of founded belief consists of evidence showing the insurer knew its position was baseless or evidence showing that the insurer "fail[ed] to undertake an investigation adequate to determine whether its position [was] tenable."[40]

The court has considered Liberty's numerous objections to Plaintiff's statement of facts. The court has concluded that the evidence relevant to the pending motion is the information Liberty acquired in processing the claim and the information that it should have sought while processing the claim. In evaluating the parties' arguments, the court has applied that standard in its analysis. For example, many of Liberty's objections to Plaintiff's declaration relate to the fact that it attempts to provide Plaintiff's own spin on what the medical diagnoses were and how the insurance claim was

---

[36] *Id.*

[37] *Rawlings v. Apodaca*, 726 P.2d 565, 576 (Ariz. 1986).

[38] Zilisch, 995 P.2d at 280.

[39] *Milhone v. Allstate Ins. Co.*, 289 F. Supp. 2d 1089, 1102 (citing *Knoell v. Metro. Life Ins. Co.*, 163 F. Supp. 2d 1072, 1077 (D. Ariz. 2001)).

[40] *Rawlings*, 726 P.2d at 576.

processed. The court relies on the medical reports and the insurance file. It only relies on Plaintiff's declaration as to his averment of harm and his assertion that he placed numerous calls to Liberty asking for a status update. Also, Liberty objects to Plaintiff's expert's declaration, primarily as improperly offering his opinion as to the ultimate legal issue. The court only relies on the expert's declaration and report as evidence of what is standard conduct in a claim investigation, not as determinative of the ultimate legal issue. As a result, the court finds it unnecessary to rule separately on each objection made by Liberty.

**A.    Objective reasonableness**

    **1.    Fairly debatable**

Liberty argues that an insurer's denial or delay in paying a claim "is not unreasonable when the claim's validity is fairly debatable."[41] It argues that the record shows that Plaintiff indisputedly had a prior right knee surgery just months before the incident at issue, and thus Plaintiff's claim for injury to that knee was at least fairly debatable as a pre-existing condition. Furthermore, it argues that the record shows that the left knee claim was also fairly debatable because Plaintiff's initial injury report did not include his left knee and his account of the work incident and his injuries evolved and was inconsistent. Indeed, given the record, Liberty's act of questioning the claim in and of itself was not unreasonable, but that does not end the inquiry. "While it is clear that an insurer may defend a fairly debatable claim, all that means is that it may not defend one that is not fairly debatable. But, in defending a fairly debatable claim, an insurer must exercise reasonable care."[42] The insurer must act reasonably during its investigation and processing of the claim. Thus, Liberty is incorrect to assert that "fair debatability" of the merits of Plaintiff's claim is the beginning and the end of the analysis.

---

[41] Doc. 111 at p. 10.

[42] *Zilisch*, 995 P.2d at 279.

### 2. Inadequate investigation

Plaintiff's allegations focus on Liberty's actions during its investigation of his claim. Plaintiff asserts that Liberty, through Stockett, failed to investigate his claim, forcing him "through a litany of unnecessary hoops,"[43] and causing a delay in payment of benefits and treatment. Relatedly, he argues Stockett was predisposed to deny his claim. An insurer "has an obligation to immediately conduct an adequate investigation" into a claim.[44] Part of that duty entails diligently searching for evidence.[45] It also entails giving due weight to all evidence; an insurer cannot ignore evidence supporting a claim.[46] In late May, Stockett made a notation in her case file stating that she was going to deny the claim because Plaintiff alleged that "he injured all of the same body parts that he has been treating for just one month prior to his injury, *other than the left knee*."[47] She noted that the decision could be rescinded. She formally denied the claim a few weeks later. The issue is whether Stockett thoroughly investigated the foundation for her denial and gave "equal consideration" to Plaintiff's needs.[48]

Plaintiff primarily argues that Stockett did not investigate his claim as it related to his left knee injury. While Liberty stresses that Plaintiff's primary complaint at the time of the incident was his right knee, there is nonetheless evidence in the record to show that he did mention left knee pain to multiple doctors shortly after the incident. He also reported to Stockett that his left knee was sore. Indeed, two doctors referred Plaintiff for a left knee MRI in May of 2013. Although Liberty points to evidence to show that the

---

[43]Doc. 140 at p. 12.

[44]*Zilisch*, 995 P.2d at 280.

[45]*Estate of Parker v. AIG Life Ins.*, 317 F. Supp. 2d 1167, 1171 (C.D. Cal. 2004).

[46]*Id.*

[47]Doc. 161 at p. 64 (emphasis added).

[48]*Demetrulias v. Wal-Mart Stores*, 917 F. Supp. 2d 993, 1004, 1005 (D. Ariz. 2013).

doctors failed to send Liberty a formal request for the left knee MRI authorization, the doctors' referrals were in their medical reports, and Liberty's claim file notes acknowledge that there had been a diagnosis related to the left knee.[49] The record shows that Stockett made her decision to deny the claim before discussing the injury with doctors or following up on whether a left knee MRI had been conducted. Plaintiff submits evidence from which a jury could infer that failure to consult with doctors before denial based on the status of the insured's medical condition is not standard practice and thus is unreasonable conduct.[50] Moreover, while Stockett indicated in her claim notes that an IME would be necessary, she then filed her formal denial before that IME happened. Drawing all inferences in favor of Plaintiff, a juror could conclude that Stockett had predetermined her decision and failed to conduct a sufficient investigation.

Stockett's deposition testimony only raises further issues for the jury. Her claim notes state that she was "denying [the] claim . . . [because Plaintiff alleges] he injured all of the same body parts that he has been treating for just one month prior to his injury, *other than the left knee*."[51] There is no reason articulated as to why the left knee injury did not support the workers' compensation claim. In her deposition, Stockett mentions that she denied the claim subject to investigation because she needed more medical records to make sure Plaintiff did not have a pre-existing injury to his left knee. Again, there is nothing in the record to document efforts taken to resolve that issue. Indeed, in her deposition she admitted that she did not think she found any evidence of a pre-existing condition before her denial.[52] Even if there had been a pre-existing condition, Plaintiff presents evidence to support his theory that Stockett should have contacted his doctors to determine whether his reported injuries had been aggravated

---

[49] Doc. 161 at p. 65.

[50] Doc. 139-2 at pp. 18, 19.

[51] Doc. 161 at p. 64 (emphasis added).

[52] Doc. 118-8 at p. 10 (Stockett deposition at p. 95).

-10-

by the work incident.[53]  Stockett explains in her deposition that her denial was primarily based on Plaintiff's inconsistent positions and not on any medical information.[54]  She does not describe, and the record does not otherwise show, efforts she took before denial to investigate her suspicion that Plaintiff was being untruthful or to clarify any inconsistencies.  Plaintiff puts forth evidence to support his argument that failure to clarify inconsistencies constitutes bad faith insurance practice.[55]  Therefore, the record, when viewed in favor of Plaintiff, could support a jury's finding of inadequate investigation and unnecessary delay.

Liberty stresses that on the day of the incident, Plaintiff did not report any injury to his left knee and otherwise highlights facts in the record that might call into doubt Plaintiff's credibility regarding the injuries suffered as a result of the work incident.  Again, the issue here is not the ultimate merits of Plaintiff's claim, but rather, whether Liberty's efforts in reviewing the merits of the claim were adequate given the circumstances, and at this summary judgment stage the court does not make credibility determinations but merely determines whether there are enough disputed issues of fact to submit to the jury.  While the facts related to Plaintiff's credibility in this matter might sway a jury in favor of Liberty on the issue of reasonable investigation, the evidence related to the investigation discussed above places reasonableness in dispute.  That is, there is support in the record from which a juror could conclude that Liberty, through Stockett, failed to adequately investigate the left knee injury before her decision to deny Plaintiff's claim.

---

[53]Doc. 139-2 at p. 19.  *Indus. Indem. Co. v. Indus. Comm'n of Ariz.*, 731 P.2d 90, 94 (Ariz. Ct. App. 1986) (explaining how workplace injuries can aggravate pre-existing injuries and be compensable).

[54]Doc. 118-8 at pp. 13, 14, 18, 20 (Stockett deposition at pp. 98, 99, 106, 108).

[55]Doc. 139-2 at pp. 18-19.

### 3. Left knee MRI authorization

Plaintiff also argues that Liberty engaged in an act of bad faith when it denied authorization of a diagnostic MRI on his left knee. As noted above, the record shows that Liberty never received a request to authorize that particular procedure. It appears from the record that while two doctors recommended a left knee MRI and indicated as much in their reports, both sent the formal request for authorization to Plaintiff's health insurance provider.[56] While there is a note in one of the doctor's records indicating that the request was supposed to be rebilled to Liberty, nothing in the record shows that was ever done.[57] Thus, the record shows confusion on the part of the doctors' offices as to the proper way to obtain approval and payment for such a procedure. It does not support a finding that Liberty ignored any specific request for authorization. However, while the delayed authorization is not a separate ground for bad faith, the record surrounding the left knee MRI is nonetheless relevant to whether Liberty adequately followed up and investigated Plaintiff's left knee claim, as discussed above.

### 4. Misrepresentations and responsiveness

Plaintiff argues that Liberty was unresponsive to his inquiries regarding his claim and failed to communicate honestly with him about his claim. Under Arizona law "the duty of good faith encompasses some obligation to inform the insured about the extent of coverage and his or her rights under the policy and to do so in a way that is not misleading."[58] Plaintiff puts forth evidence to show that he called Liberty multiple times to inquire about his claim status after his doctor had ordered a left knee MRI.[59] Liberty again focuses on the fact that the MRI approval request was never formally made, but

---

[56] Doc. 114-1 at p. 32; doc. 118-5 at pp. 39-45 (Knowles deposition at pp. 153-159).

[57] Doc. 117-1 at pp. 30.

[58] *Nardelli v. Metro. Grp. Prop. and Cas. Ins. Co.*, 277 P.3d 789, 800 (Ariz. Ct. App. 2012).

[59] Doc. 139-1 at p. 2.

that fails to address the argument that Liberty did not respond to Plaintiff's inquiry and at least inform him that it did not have request for authorization from the doctor and that Liberty did not inform Plaintiff as to what was needed to properly request authorization. Plaintiff also points to the fact that Stockett had decided to deny the claim on May 31, but she nonetheless told Plaintiff that she had not made a decision yet.[60] Looking at all the evidence in the record and drawing all inferences in favor of Plaintiff, a reasonable juror could conclude that Liberty failed to accurately communicate its denial or reasons supporting the denial to Plaintiff.

**B.    Subjective reasonableness**

As noted above, the tort of bad faith also requires Plaintiff to prove a subjective element of unreasonableness. He must show that Liberty knew or was reckless as to whether its conduct was reasonable. This element can be proven with evidence that Liberty either actually knew its position was baseless or that it "fail[ed] to undertake an investigation adequate to determine whether its position [was] tenable."[61] Therefore, "[a] failure to investigate theory may result in some overlap in the first two elements of the bad faith analysis."[62] Evidence that supports objective unreasonableness in failing to investigate a claim also supports the existence of the subjective element of bad faith.[63] Consequently, there is sufficient evidence from which a jury could conclude that Stockett's conduct constituted bad faith.

**C.    Damages and causation**

While Plaintiff has presented sufficient evidence to sustain a claim of unreasonable conduct, the tort of bad faith, like any tort, also requires proof of

---

[60]Doc. 161 at p. 64; doc. 139-1 at p. 3.

[61]*Rawlings*, 726 P.2d at 576.

[62]*Demetrulias*, 917 F. Supp. 2d at 1006-07.

[63]*Id.*

-13-

causation and damages.[64] Liberty argues that Plaintiff has failed to put forth any evidence of harm. Liberty points to the undisputed fact that all of Plaintiff's medical bills and compensation for the period he was off work was ultimately paid in September of 2013. They argue that the delay did not cause him financial harm because the record shows that his wife had a good salary.[65] Plaintiff does not respond specifically to this argument. His complaint and affidavit simply state that he experienced added pain and suffering from the delay.[66] One of his treating doctors, Dr. Dewanjee, testified at his deposition that given the type of left knee injury Plaintiff suffered, a delay would not make the injury worse but would nonetheless extend Plaintiff's pain.[67] Plaintiff also asserts that he experienced financial harm because of the delay, but he did not provide evidence demonstrating any specific financial harm, except by averring that he had to hire a lawyer to obtain his benefits.[68] This court finds the question of damages to be a close call and notes that Plaintiff's case for damages is certainly weak. However, the court finds that Plaintiff's assertion that he suffered extended pain and pecuniary losses from the delay and the doctor's supporting testimony is sufficient to withstand a motion for summary judgment.[69]

---

[64]*Id.* at 1010.

[65]Doc. 117-6 at p. 2 (McBride deposition at p. 112).

[66]Doc. 1 at p. 5; doc. 139-1 at p. 6.

[67]Doc. 139-7 at p. 4 (Dewanjee deposition at p. 72). Liberty has filed a motion *in limine* challenging Dr. Dewanjee's ability to offer his opinion as to causation because of Plaintiff's failure to comply with Rule 26(a)(2)(C). The court relies on Dr. Dewanjee's deposition only for evidence on the type of tear Plaintiff suffered and what the consequences would be for failing to treat such a tear. The motion *in limine* does not challenge this opinion, and the court finds that it is properly considered here.

[68]Doc. 139-1 at p. 6.

[69]*See Rawlings*, 726 P.2d at 577 (a bad faith claimant "may recover all the losses caused by [the] defendant's conduct, including damages for pain, humiliation and inconvenience, as well as for pecuniary losses.").

1 Liberty also argues that Plaintiff cannot demonstrate that it was the cause of his harm. It again points to the fact that his doctors failed to properly file a request for the left knee MRI and, therefore, the failure to diagnose and treat the left knee was the result of his medical care providers and not a result of Liberty's conduct. It also points to the fact that his doctors released him for work at the end of June. Indeed, there are facts that support Liberty's argument that it did not cause Plaintiff any harm and, again, Plaintiff's case on the causation element is weak given the record, but it is nonetheless disputed as to whether Stockett's investigation was reasonable, and viewing the evidence in favor of Plaintiff, a jury could possibly infer that Liberty's conduct in investigating the claim and communicating with Plaintiff was a substantial contributing factor to the treatment delay.

**D.   Punitive damages**

Punitive Damages are appropriate "when, *and only when*, the facts establish that defendant's conduct was aggravated, outrageous, malicious or fraudulent."[70] A plaintiff seeking punitive damages for insurance bad faith must put forth evidence that "reflects 'something more' than the conduct necessary to establish the tort."[71] While facts showing a failure to investigate can establish the tort of bad faith, those same facts alone will not support a claim for punitive damages. Punitive damages require additional evidence showing that the insurer was "guided by an evil mind which either consciously sought to damage the insured or acted intentionally, knowing that its conduct was likely to cause unjustified, significant damage to the insured."[72] Such

---

[70] *Id.* at 578.

[71] *Id.* (citing *Farr v. Transamerica Occidental Life Ins. Co.*, 699 P.2d 376, 380 (Ariz. Ct. App. 1984)).

[72] *Id.*

evidence is usually shown through circumstantial evidence, such as evidence showing a pattern of similar practices on the part of the insurer.[73]

Here, there is no direct evidence of Liberty's intent to harm Plaintiff. Plaintiff argues that all the circumstantial evidence presented in the record taken in total demonstrates that there is at least a disputed issue regarding Liberty's "evil mind." Plaintiff cites to *Mendoza v. McDonald's Corporation*,[74] *Newman v. Select Specialty Hospital-Arizona, Inc.*,[75] and *Temple v. Hartford Insurance Co. of Midwest*[76] in support. The court agrees with Liberty that these three cases involve much more egregious conduct than has been presented here. In *Mendoza*, there was evidence of intentional doctor shopping to find a doctor who would support a denial. In *Temple*, there was evidence of the insurer trying to persuade medical providers to remove work restrictions and the insurer hiring surveillance and asking the investigator to look for a reason to deny the workers' compensation claim. In *Newman*, there was evidence that the defendants ignored explicit medical orders despite knowing that the plaintiff's condition could worsen and could place the plaintiff at risk of serious harm. The court concludes that the evidence Plaintiff presents in support of his bad-faith claim does not sustain a reasonable inference that Liberty acted egregiously and with the requisite intent to harm. Moreover, Plaintiff has not provided any evidence to show that Liberty has a pattern of similar unfair practices from which a jury could infer malicious intent.

## V. CONCLUSION AND RECOMMENDATION

Based on the preceding discussion, Defendant's motion for summary judgment is GRANTED IN PART AND DENIED IN PART. It is denied as to Plaintiff's claim for bad faith, but granted as to Plaintiff's claim for punitive damages.

---

[73]*Hawkins v. Allstate Ins. Co.*, 733 P.2d 1073, 1081 (Ariz. 1987).

[74]213 P.3d 288, 307-08 (Ariz. 2009).

[75]No. 13-cv-0665, 2016 WL 1377634, at *3-*4 (Ariz. Ct. App. April 7, 2016).

[76]40 F. Supp. 3d 1156, 1171 (D. Ariz. 2014).

As suggested above, the court's present view is that Plaintiff's compensation damage claim is weak and of modest dimension. The court highly recommends that the parties explore settlement prospects with that preliminary view in mind.

DATED this 19th day of May 2016

/s/ JOHN W. SEDWICK
SENIOR UNITED STATES DISTRICT JUDGE